UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF THE STATE OF NEW YORK
-----------------------------------------------------------------------x

RICHARD KOESTER,

Civ. No.

Plaintiff,

**COMPLAINT**
**WITH JURY DEMAND**

-against-

MICHAEL LANFRANCHI, EDDIE RAMOS, JR.,
JAMES TSU, SALVATORE J. PAGLIARO, CHARLES
J. GUDDEMI, IAN CRANE, JOHN J. PICCOLO, S.B.
WAITE a/k/a SUMNER B. WAITE, CHRISTOPHER
PAPPAS, THOMAS H. WILKINS, UNITED STATES
PARK POLICE, NATIONAL PARKS SERVICE,
DEPARTMENT OF THE INTERIOR, and THE
UNITED STATES OF AMERICA,

Defendants.

-----------------------------------------------------------------------x

Plaintiff, bringing this action against the above-named defendants alleges as and for his

complaint as follows:

## DESCRIPTION OF ACTION

1.     This action is brought to procure judgment in favor of the plaintiff RICHARD

KOESTER, an individual employed by the defendant United States Park Police, which is a

branch of the National Parks Service, operated by the Department of Interior, to recover damages

against the defendants under 42 U.S.C. §1983 for violations of his constitutional and civil rights

under, *inter alia*, the Fourth, Fifth and Fourteenth Amendments of the United States Constitution

and claims under the Federal Tort Claims Act for, *inter alia*, false imprisonment, false arrest,

malicious prosecution, and abuse of process.

2.     All notices required to be given hereunder under the Federal Tort Claims Act

COMPLAINT                                                                                        1

under 28 U.S.C. § 2675(a) have been duly given.

## VENUE

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  All of the acts complained of and the conduct constituting the federal violations of law, including the violations of plaintiff's civil rights, were inflicted upon plaintiff within the Southern District of New York. Moreover, many of the prospective witnesses reside within the Southern District.

## PARTIES

4.      Plaintiff RICHARD KOESTER is an individual residing in the State of New York, County of Nassau, to wit: 137 Meridian Road, Levittown, New York 11756.

5.      At all times hereinafter mentioned, and upon information and belief, defendant MICHAEL LANFRANCHI is an individual residing at 106B Mont Sec Avenue, Staten Island, New York 10305 and is employed by the United States Park Police.  Mr. LANFRANCHI is sued herein individually and in his official capacity.

6.      At all times hereinafter mentioned, and upon information and belief, defendant EDDIE RAMOS, JR. is a resident of the State of New York, address unknown, and is employed by the United States Park Police.  Mr. RAMOS is sued herein individually and in his official capacity.

7.      At all times hereinafter mentioned, and upon information and belief, defendant JAMES TSU is an individual residing at 34 Remsen Street, Valley Stream, New York 11580, and is employed by the United States Park Police.  Mr. TSU is sued herein individually and in his official capacity.

8.      At all times hereinafter mentioned, and upon information and belief, defendant

SALVATORE J. PAGLIARO is an individual residing at 5 Tanglewylde Avenue, Apt. 6E,

Bronxville, New York 10708, and is employed by the United States Park Police.  Mr.

PAGLIARO is sued herein individually and in his official capacity.

9.     At all times hereinafter mentioned, and upon information and belief, defendant

CHARLES J. GUDDEMI is an individual residing at 319 Sycamore Street, Staten Island, New

York, and is employed by the United States Park Police.  Mr. GUDDEMI is sued herein

individually and in his official capacity.

10.    At all times hereinafter mentioned, and upon information and belief, defendant

IAN CRANE is a resident of the State of Pennsylvania, address unknown, and was formerly

employed by the United States Park Police.  Mr. CRANE is sued herein individually and in his

official capacity.

11.    At all times hereinafter mentioned, and upon information and belief, defendant

JOHN J. PICCOLO is an individual residing at 552 West Market Street, Long Beach, New York

11561, and is employed by the United States Park Police.  Mr. PICCOLO is sued herein

individually and in his official capacity.

12.    At all times hereinafter mentioned, and upon information and belief, defendant

S.B. WAITE (a/k/a SUMNER B. WAITE) is an individual residing at 453 Adams Avenue,

Staten Island, New York 10306, and is employed by the United States Park Police.  Mr. WAITE

is sued herein individually and in his official capacity.

13.    At all times hereinafter mentioned, and upon information and belief, defendant

CHRISTOPHER PAPPAS is a resident of the State of New York, address unknown, and is

employed by the United States Park Police.  Mr. PAPPAS is sued herein individually and in his

official capacity.

14.    At all times hereinafter mentioned, and upon information and belief, defendant THOMAS H. WILKINS is a resident of the State of New York, 107A Mont Sec Avenue, Staten Island, New York, and was formerly employed by the United States Park Police. Mr. WILKINS is sued herein individually and in his official capacity.

15.    At all times hereinafter mentioned, the defendant NATIONAL PARKS SERVICE is a federal agency operated by the Department of the Interior, having headquarters located at 1849 C Street N.W., Washington, D.C. 20240.

16.    At all times hereinafter mentioned, the defendant UNITED STATES PARK POLICE is a federal police force serving the NATIONAL PARKS SERVICE, having headquarters located at 1849 C Street N.W., Washington, D.C. 20240, and a New York Field Office at Floyd Bennett Field, Brooklyn, New York 11234.

17.    At all times hereinafter mentioned, the defendant DEPARTMENT OF THE INTERIOR is a governmental department and agency of the United States of America, having headquarters at 1849 C Street N.W., Washington, D.C. 20240.

## FACTUAL ALLEGATIONS

18.    In and around 1996, plaintiff RICHARD KOESTER became employed by the United States Park Police ("USPP") as a federal Police Officer. Upon information and belief, the USPP is a branch of the National Parks Service, which is operated by the United States Department of the Interior.

19.    Prior to joining the USPP, plaintiff was a veteran, having served in the United States Marine Corp. from 1984 to 1988. Plaintiff also completed Army Officer School in

August 1999, is a New York Army National Guard Officer, and is a graduate of the Wharton School of Business.

20.     Starting in April 1997, Plaintiff was assigned to protect and patrol the Statue of Liberty National Monument located in New York.   Plaintiff performed his duties diligently and conscientiously and greatly enjoyed his position as a federal park police officer.

**The "Radio Incident"**

21.     Upon information and belief, in 2000, there was a radio shortage for officers working at the Statue of Liberty.  Moreover, the radio storage area, was an unsecured area to which many people had keys and access, which, upon information and belief, resulted in numerous radios being confiscated.

22.     Although there was an informal "Radio Logbook," which purported to show when radios were taken out and returned by the police officers patrolling the Statute of Liberty, almost none of the officers signed the Logbook, so that the supervisors never knew where one particular radio was at any given moment.  There was no procedure utilized or enforced by the USPP as to the signing out of radios.

23.     Upon information and belief, despite knowing that radios were being stolen and/or taken, the plaintiff's supervisors failed to follow General Orders[1] for either conducting a crime investigation (G.O. 2310), or an unsecured installation (G.O. 2201), or filing a certificate of loss (G.O. 3401.03.C2).

24.     Plaintiff was concerned about his safety and the security of the Monument, since

---

[1] The National Parks Service promulgated a set of orders known as "General Orders" to govern the conduct of its officers.

he was assigned to the night shift at the Statute of Liberty.  In addition, plaintiff wanted to maintain radio contact with Liberty Dispatch at all times while he was in uniform so as to be able to report any unusual occurrences he might see leaving or entering the site.

25.     There had been two dead bodies found near the Liberty State Park just that year. Thus, for his own safety, Plaintiff wished to have a radio on his person whenever he was in uniform on the work-site premises.

26.     Plaintiff was authorized to keep certain equipment with him off duty, pursuant to G.O. 70.00 ILH which states: "Force issued equipment, such as keys, handcuffs and case, ammunition and pouch, tear gas dispenser and case, radio and case, service weapon and holster, and pager, **may be carried off duty if desired**." (emphasis added)

27.     Indeed, since 1997, when plaintiff was first issued his radio, he carried it home with him for the security of the site and for his personal safety, and also to ensure that he had a radio when he next reported to work.

28.     On May 21, 2000, plaintiff reported for duty, and was approached by defendant, Sergeant Charles J. Guddemi.  Sgt. Guddemi demanded to know where plaintiff had obtained his radio. When plaintiff informed him that he carried the radio off-duty, Sgt. Guddemi then proceeded to loudly berate plaintiff in front of many other officers for taking the radio home and for not signing the logbook, even though there was no procedure set up for doing so.

29.     Sgt. Guddemi singled plaintiff out for not signing his radio out and for taking the radio home with him, although upon information and belief, no other officers signed their radios in and out.

30.     Several days later, on May 23, 2000, and again on May 24, 2000, plaintiff was

again approached by Sgt. Guddemi. Sgt. Guddemi again demanded to know if plaintiff had taken his radio home, which plaintiff answered in the affirmative.

31.     Sgt. Guddemi responded by threatening plaintiff with Insubordination charges, and started screaming at plaintiff and put his finger in plaintiff's face, screaming that plaintiff was ordered to leave his radio in the charger at the Statue of Liberty and was not permitted to take it home that evening, and if he did so, plaintiff would be suspended.

32.     Although plaintiff did not believe that this was a lawful order, inasmuch as it compromised officer and site safety, plaintiff complied with that order and did not take the radio home with him that night or any other night thereafter.[2]

33.     During the time when plaintiff was forced to enter and leave the site without his radio, he observed numerous security breaches but was unable to radio dispatch with the information. As plaintiff left the post, he had to unsecure the installation at the Ellis Island gate and the Liberty State Park gates, for site-security reasons.  As plaintiff unsecured the gates, cars that were waiting passed through the gates on the other side, constituting a breach of security, but plaintiff was unable to call dispatch to have them contact New Jersey State Police (which has concurrent control over the park).

34.     The radio shortage problem continued throughout 2000.  In early December 2000, plaintiff reported for duty and found that there was no radio available for him to use.

35.     Although there were radios apparently locked up inside the supervisor's office, there was no supervisor to open the office because Sgt. Guddemi, who was supposed to be on

---

[2] Thereafter, an administrative complaint was filed against plaintiff which accused him of failing to obey a lawful order, which resulted in a written reprimand dated February 8, 2001, which plaintiff is appealing through the grievance procedure under his collective bargaining agreement.

duty that day, had left early.

36.     Plaintiff then borrowed a radio from another officer and called Liberty Dispatch to report that there were no radios, and asked Dispatch to assign plaintiff a "Hazardous Condition" number so plaintiff could file a report.

37.     Approximately one hour later, Sgt. Ian Crane arranged for someone to come to the office to open it and give plaintiff a radio.

38.     Thereafter, plaintiff filed a Hazardous Condition report, believing that a lack of radios at a national monument was a disaster waiting to happen, but his supervisors ignored his concerns and failed to investigate the Hazardous Condition report.

39.     Indeed, plaintiff was advised by defendant IAN CRANE that no-one would sign the Hazardous Condition report and that it would be detrimental to his career if he continued to push the report through.

40.     As a result, *inter alia*, of plaintiff's status as a veteran and his diligent attention to his duties, as exemplified by this radio incident, upon information and belief, Plaintiff was perceived as a "troublemaker" and/or not a desirable member of the park police.

41.     Upon information and belief, other park police officers who were veterans of the United States military were similarly subjected to unnecessary or unfounded administrative complaints or disciplinary measures.

42.     During and after this incident, plaintiff was harassed by his superiors and was the victim of unfounded administrative complaints.  Upon information and belief, the defendants, including THOMAS H. WILKINS, CHRISTOPHER PAPPAS, IAN CRANE, and CHARLES J. GUDDEMI looked for reasons to "get rid" of plaintiff and/or to cause him harm and injury.

43.     For example, in February 2001, plaintiff's roommate accused plaintiff of such things as stealing umbrellas and bathroom rugs, and numerous other unfounded and baseless complaints. This roommate (a former seminary student) also complained that plaintiff entertained female guests at the home, and often insulted these guests.

44.     The roommate filed a complaint against plaintiff on February 19, 2001, which alleged that they had had an argument and that plaintiff had allegedly touched the roommate with his baton.

45.     As a result of this unfounded administrative complaint filed by his roommate, on February 22, 2001, plaintiff was directed to report to defendant, Lieutenant Chris Pappas's office at Ellis Island. Once there, plaintiff was shocked to learn that his police powers and authority were being suspended pending the investigation of the roommate's complaint.

46.     PAPPAS took away plaintiff's gun and badge, and plaintiff was placed on restrictive duty status. At no time was plaintiff given a copy of this alleged "complaint" filed by his roommate.

47.     Significantly, although his suspension was purportedly due to the investigation of his roommate's complaints of assault and harassment, neither plaintiff nor his roommate were re-assigned and they continued to live together.

48.     Then, on March 5, 2001, Plaintiff was officially reassigned by the Acting Commander NEIL LAURO from the Statue of Liberty patrol to the Brooklyn/Queens District Communications Section. Plaintiff was also prohibited from entering any United States Park Police facility during his off-duty hours, unless he had prior supervisory approval.

49.     The defendants took this unprecedented disciplinary action against plaintiff with

malice aforethought, in an effort to force him to leave the job and/or seek reassignment to a different post, as part of their policy and practice to "get rid" of plaintiff.

50.     Shortly after these incidents, plaintiff wrote a letter to the Office of the Inspector General, Department of the Interior on March 7, 2001, detailing the problems with site security at the Statue, the "radio incident," the mismanagement by supervisors and harassment of officers, and general abuse of authority and power.   Plaintiff did not receive a response to that letter.

51.     Upon information and belief, the defendants knew that plaintiff had written a "whistleblower" letter to the Department of the Interior, which only further fueled their dislike and ill-will towards plaintiff, and motivated them to continue their customary attitude and policy towards plaintiff.

**Plaintiff's Wrongful Arrest and Imprisonment**

52.     On March 11, 2001, at approximately 9:35 P.M., plaintiff (who was asleep in his residence) received a call from fellow officer Joseph Rodriguez, who asked plaintiff to "come outside."

53.     Plaintiff opened the door and was shocked and humiliated to see a spectacle of at least 6 patrol cars with their lights on, and twice as many officers and supervisors, on the sidewalk outside his residence.

54.     Plaintiff walked over to Officer Rodriguez, who told plaintiff that he was required to come to Room 210 of the Station House for questioning.   When plaintiff asked why, Officer Rodriguez stated that a complaint had been made against plaintiff by a woman.

55.     Plaintiff had recently spent some time with an Asian woman named Mou Zheng,

a/k/a "VENUS"[3] with whom he had had consensual sex for several days. She and plaintiff had

had an argument and she had left his apartment earlier that day at plaintiff's request, angry and

annoyed.

56.    Unbeknownst to plaintiff, VENUS was apparently a prostitute from China who

placed personal ads on the Internet to meet men (falsely claiming to be a successful stockbroker

in China), came to America to meet them, and tried to obtain money and gifts from them. She

was annoyed that plaintiff did not spend as much money on her as she wished, that he criticized

the fact that the pictures she had sent did not resemble her, and that he had accused her of

misrepresenting herself.

57.    Apparently annoyed that she had been unable to get money from plaintiff, after

VENUS left the house, she showed the guard the plaintiff's business card and asked to see

plaintiff's supervisor.

58.    The guard took VENUS to the station house at approximately 4:40 P.M. on March

11, 2002. Defendants Salvatore Pagliaro, James Tsu, Eddie Ramos, Jr. and Michael Lanfranchi

were there to interview her.

59.    Although the defendants, as Park Police Officers, have only the most nominal

involvement in law enforcement activities, and although any alleged crime should have been

referred to the local police department for investigation which has concurrent jurisdiction with

the USPP, the defendants proceeded to "interview" VENUS.

60.    Upon information and belief, it was the practice and procedure for the USPP to

---

[3] "VENUS" was Mou Zheng's e-mail name. She and plaintiff had corresponded via the Internet for a few
weeks and she had come to visit him while she was in the State seeing other friends.

refer all allegations of criminal activity directly and immediately to the New York Police Department for investigation, rather than conduct any investigation itself, since USPP was inadequately trained and lacked sufficient experience in such matters.

61.     During that interview, VENUS, a Chinese citizen, admitted to having solicited plaintiff's companionship over the Internet and admitted having consensual sexual intercourse with Plaintiff, but then accused plaintiff of forcing her to have sex the night before. Upon information and belief, VENUS was not upset, was calm, enjoyed the unsupervised use of a federal government computer to access her e-mail, was given food, and was seen laughing and smiling throughout her "interview."

62.     The fact that VENUS did not report the alleged "rape" until plaintiff had asked to leave his residence, her cheerful demeanor as evidenced by her laughing, smiling, and request to read her e-mails, and her admissions that she had willingly had consensual sex with plaintiff, clearly constituted circumstances under which the veracity of the complaining witness was doubtful and failed to give rise to probable cause.

63.     And yet, rather than refer the matter to the local police station, the defendants seized the opportunity to maliciously harm plaintiff and decided to bring him in for questioning.

64.     Embarrassed and humiliated, standing outside of his house surrounded by officers at 9:30 at night, plaintiff asked if he could return to his home to get dressed, since plaintiff was dressed in a short-sleeved T-shirt and shorts, at which point Officer Rodriguez told plaintiff he was not permitted to go back into his home unless plaintiff was accompanied by officers. Plaintiff was not given any "Miranda" warnings.

65.     Plaintiff walked into his home accompanied by at least 5 or 6 officers and

detectives, who roamed freely around his apartment on both floors, walked through the rooms and hallways, and stayed in the room while plaintiff got dressed.

66.    Plaintiff and the officers then left plaintiff's residence, and an officer drove plaintiff to Room 210 of the Station House, where he was placed in a small "questioning room" with defendants Michael Lanfranchi, James Tsu, and Eddie Ramos, Jr.

67.    Plaintiff underwent approximately one half-hour of questioning by the detectives. Plaintiff admitted being with VENUS over the last several days and stated that she had left angry because plaintiff was no longer interested in her. He vehemently denied any forcible sexual contact.

68.    After the questioning, the detectives presented plaintiff with a consent to search form and told him to sign it. They threatened that if he did not sign it, it would only get worse for plaintiff. Plaintiff signed the consent form.[4]

69.    The detectives then took a break and left plaintiff in the room alone. At that point, the defendant, Lieutenant Waite came into the room and told plaintiff that he was going to be put on indefinite administrative leave while the investigation into this complaint continued.

70.    By this time, plaintiff had been confined in the questioning room at the Station House for 2 hours, from approximately 9:35 P.M. until 11:35 P.M.

71.    Plaintiff remarked to defendant WAITE that he had recently written a letter to the Office of the Inspector General ("OIG") relating to the numerous problems and deficiencies of the New York Field Office.

---

[4] During that search conducted by defendant, I.D. Technician PICCOLO, the federal police seized plaintiff's personal computer, his bedsheets, blankets, and pillow cases, a garbage bag, his passport, a computer disc, his telephone machine answering tape, and a notebook.

72.     After plaintiff made this remark to WAITE, WAITE left the room, and approximately 2 minutes later, the three officers came into the room, told plaintiff he was under arrest.

73.     The arrest was without a warrant, without probable cause and was motivated by an improper purpose, and defendants knew or should have known that there was no probable cause for an arrest.

74.     Upon information and belief, defendants and others were heard stating words to the effect of "we got him" after plaintiff's arrest, and were seen laughing about it.

75.     In addition to those defendants who did the actual questioning and arrest, the other defendants encouraged, authorized, and approved the improper and unlawful arrest and violation of plaintiff's rights and did nothing to prevent it.

76.     While plaintiff was being arrested, VENUS was taken to the Staten Island University Hospital to be evaluated for her claim of rape.  The defendants did not await the results of that evaluation, but rather arrested plaintiff immediately.

77.     Notwithstanding the lack of any evidence against plaintiff, and notwithstanding their failure to properly investigate and interview the complainant, and notwithstanding that they did not have any medical evaluation done, and notwithstanding that the matter should have been referred to the New York Police Department for a proper investigation, plaintiff was handcuffed by Detectives Lanfranchi and Tsu and placed in a patrol car, and transported to the 120th Precinct in Staten Island for processing at approximately 11:45 P.M.

78.     The defendants listed 4 charges as the basis for the arrest, including "unlawful imprisonment," "sexual assault" and "sodomy in the third degree."

COMPLAINT

14

79.     The defendants' interview with VENUS did not provide any basis for probable cause inasmuch as she admitted having consensual sex with plaintiff on several occasions, admitted returning to plaintiff's residence to be with him, and admitted having solicited his companionship over the Internet.

80.     VENUS also claimed that the alleged rape had occurred at 8:00 P.M. the evening before, but did not explain why she had waited until 4:30 P.M. the next day to report the alleged crime, when she had been walking freely around the grounds of Fort Wadsworth earlier that day and could have reported any alleged "crime" at any time.

81.     Defendants knew or should have known that there was no probable cause to arrest plaintiff for any sexual misconduct or assault.

82.     Defendants also knew that VENUS was not "imprisoned" by plaintiff since she admitted that she had been in her own hotel room at the Navy Lodge for 2 nights, and had left the plaintiff's apartment on several occasions.   Nevertheless, defendants maliciously and falsely arrested plaintiff for "unlawful imprisonment" as well as various sexual offenses.

83.     Plaintiff was fingerprinted, searched, had his shoelaces taken away, and was placed in a holding cell.  Because of the late hour, plaintiff was unable to be arraigned, was not permitted to call anyone, and was forced to spend the night in the holding cell.

84.     The next morning, March 12, 2001, plaintiff was brought downstairs and handcuffed to several other prisoners, and then placed in a van where he were transported to the courthouse.  At the courthouse, plaintiff was placed in another holding cell.  Again, no opportunity was given to plaintiff to make a telephone call.

85.     Plaintiff passed the entire day in the holding cell waiting to be arraigned.  When it

COMPLAINT

Rodriguez on the evening of March 11, 2001.

93.    At approximately 6:00 A.M. on March 13, 2001, plaintiff was informed that his bail was paid. However, plaintiff was not immediately released because the "captain" had to sign the papers and would not be in until later that day.

94.    Plaintiff was again taken from the cell and brought upstairs to another cell to have his property inventoried. Plaintiff spent the afternoon in this cell, and was finally released in the late afternoon. Plaintiff took a taxi back to his home.

95.    Upon returning home, plaintiff immediately fell asleep, but was awoken by a knock about 20 minutes later. Two officers were at the door, with two women who were in charge of the government housing, and handed plaintiff an eviction notice, "effective immediately" requiring plaintiff to leave his assigned government housing within 48 hours.

96.    The Notice of Eviction evicted plaintiff from his home in violation of his lease, known as an "Assignment Agreement" which required 30 days prior written notice of termination, and improperly re-assigned plaintiff to a different section of the facility with his lease to expire by April 15, 2001. Plaintiff's request for an extension of this lease was denied.

97.    On March 22, 2001, a Grand Jury indicted plaintiff on two counts of Felony Sodomy. Plaintiff pleaded not guilty to the charges. Upon information and belief, the Grand Jury did not want to indict plaintiff, but the defendants pushed for an indictment, falsely embellished the evidence given to the Grand Jury, and suppressed exculpatory evidence.

98.    Notably, plaintiff was not indicted for any of the charges listed by the defendants on plaintiff's arrest sheet such as "Unlawful Imprisonment" or "Sexual Assault."

99.    In and around April 27, 2001, Plaintiff was suspended from his job and pay status

for an indefinite term by the United States Park Police by the Chief, United States Park Police, pending disposition of the criminal charges pending against him.

100.    Although the suspension was effective May 2, 2001, the defendants maliciously cut off plaintiff's pay as of early April 2001, almost a month before the suspension would be effective.

**The Hospital Records**

101.    After filing her "complaint," VENUS was taken to Staten Island University Hospital the evening of March 11, 2001.  During that examination, the hospital records show that she advised the doctors and nurses that she had had consensual anal and oral sex with plaintiff.  The hospital records also confirm that she was menstruating: "Patient currently on period."  She told the doctors there had been no physical force used on her.

102.    She was referred to a rape victim counselor, and offered a "rape kit" test to test for the presence of sperm in her anus.  The hospital records show that VENUS declined the test: "Patient doesn't want rape kit performed" and again "Patient refuses the rape kit to be performed."

103.    VENUS was also examined by a gynecological resident and a rape victim advocate, who determined after speaking with her and reviewing the medical evidence that she was not raped: "Seen by gyn. resident - see rape victim advocate also stated that they feel this is not rape." (emphasis in original)

104.    The report also contains her statement that she had consensual sex with plaintiff and that she was "happy Wednesday night [and] Thursday" after having had oral and anal sex with plaintiff.  The statement further states that she had anal and oral sex with plaintiff on

Saturday night.

105.   Upon information and belief, this hospital report was provided to the defendants and to the District Attorney's office.

106.   Clearly unhappy with the statements given by VENUS to the Staten Island University Hospital's Emergency Department, and unhappy with her refusal to take the rape-kit test, the defendants and/or the District Attorney's office caused VENUS to be brought to a different hospital, Sisters of Charity Medical Center, St. Vincent's Campus, the next day, on March 12, 2001.

107.   During that examination, at which she was personally accompanied by a representative from the D.A.'s office and defendant JOHN J. PICCOLO, she claimed that she had been raped and a rape-kit test was performed.  The results of those tests were inconclusive as to the presence of sperm.

108.   Despite knowledge of the first hospital record, the defendants and the District Attorney's Office only provided plaintiff's counsel with the records from the second hospital.

109.   Plaintiff had now suffered the trauma of being arrested, was evicted from his home, under indictment for two felonies, and placed on leave from his job without pay.  In April, when his government housing ended, plaintiff was forced to move into his mother's home.

110.   Six months later, while the charges against plaintiff were still pending in September 2001, VENUS had returned to New York again to meet a man named "Bill Steele" she had corresponded with on the Internet, who had described himself in an e-mail as a wealthy businessman. VENUS engaged in e-mails with "Mr. Steele" and signed off by calling herself his "Chinese Flower."

111.    Upon questioning, VENUS admitted to the District Attorney's Office that she had "Mr. Steele" when she placed a personal ad on the Internet, that "Mr. Steele" supplied her with a round trip airplane ticket to New York and met her at the airport, where they stayed at a hotel in Manhattan for two nights, September 9 and 10, 2001.

112.    Upon information and belief, realizing that her criminal activity as a prostitute would be discovered, VENUS thereafter refused to prosecute plaintiff for the alleged charges of sexual abuse, and advised the District Attorney's office that she would have no further contact with them.

113.    On January 18, 2002, all charges brought against Plaintiff were dismissed on the recommendation of the Assistant District Attorney for Richmond County.

114.    The Recommendation for Dismissal of Indictment filed by the District Attorney's office stated in relevant part that:

> "The people's case rests almost entirely on the testimony and therefore, the credibility of the complainant. Given her alleged experience in March with the Defendant, the fact that she would post a personal ad on the Internet and return to New York in response to an e-mail message from a stranger is very troubling. That she would spend two nights in a hotel with that stranger, regardless of her intent, reduces her credibility to the point where the people will be unable to sustain their burden of proof at trial."

115.    Thereafter, by letter dated February 13, 2002, the Department of the Interior advised plaintiff that his "Indefinite Suspension" was terminated and he was returned to pay status, retroactive to January 19, 2002.

116.    At the present time, defendants refuse to allow plaintiff to return to his post at the Statue of Liberty, have refused to return his government housing to him, and have refused to return plaintiff's personal property which was unlawfully seized by the defendants.

seizure of his person, papers, and effects, and of his right to freedom from unlawful arrest,

detention, and imprisonment, all of which rights are secured to plaintiff by the Fourth, Fifth, and

Fourteenth Amendments to the Constitution of the United States, and by 42 U.S.C. §§ 1983 and

1988.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### UNDER 42 U.S.C. §1983
### (FOURTH AMENDMENT - FALSE ARREST)

123.    Plaintiff repeats and reiterates the allegations contained in paragraphs marked and

designated "1" through "122" of this complaint with full force and effect as if more fully set forth

at length herein.

124.    Plaintiff had a clear right to be free from unreasonable searches and seizures as

guaranteed to him under the Fourth Amendment to the Constitution of the United States, which

right was known to the defendants.

125.    The individual defendants herein acted under color of federal law, pursuant to a

custom, policy, and practice of the defendants.

126.    By virtue of their conduct in, *inter alia*, seizing plaintiff from his home, searching

his residence, and unlawfully placing him under arrest without a warrant and without probable

cause, the defendants have violated plaintiff's constitutional rights under the Fourth

Amendment.

127.    By virtue thereof, plaintiff is entitled to damages in an amount to be established at

trial but believed to be no less than $10 Million Dollars.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### UNDER 42 U.S.C. §1983
### (FOURTEENTH AMENDMENT - FALSE IMPRISONMENT)

128.    Plaintiff repeats and reiterates the allegations contained in paragraphs marked and designated "1" through "127" of this complaint with full force and effect as if more fully set forth at

length herein.

129.    Plaintiff had a clear right to be free of unreasonable or unwarranted restraints on his personal liberty as guaranteed to him under the Fourteenth Amendment to the Constitution of the United States, which right was known to the defendants.

130.    The individual defendants herein acted under color of federal law, pursuant to a custom, policy, and practice of the defendants.

131.    Plaintiff was confined when he was rousted from his sleep and not permitted to return to his home, and confined when he was placed in the questioning room to be interrogated by the defendants.

132.    After plaintiff's unlawful arrest without a warrant and without probable cause, he was further confined by the defendants when they caused him to be incarcerated on March 11, 2001, said confinement being intended by defendants and carried out without the existence of probable cause or a warrant.

133.    Plaintiff was conscious of the confinement as he was taken from his residence and not permitted to return without police accompaniment, and thereafter transported to the 120th precinct and incarcerated therein, and thereafter transported to the Brooklyn House of Detention where plaintiff spent almost 36 hours in custody.

134.    Plaintiff did not consent to said incarceration or confinement which resulted, *inter alia,* from defendant's vindictive actions of prosecuting Plaintiff for alleged actions that

COMPLAINT

defendants had no probable cause to believe actually took place.

135.    As no probable cause for the arrest and imprisonment existed and there was no valid order or warrant for Plaintiff's incarceration, Plaintiff's confinement was not privileged.

136.    Plaintiff was further falsely imprisoned by reason of his being under indictment without probable cause, for the period from when he posted a bond to secure his release from prison, until the date that the charges were dismissed on January 18, 2002.

137.    By virtue of their conduct in, *inter alia*, causing plaintiff to be detained and imprisoned against his will, plaintiff was falsely imprisoned, in violation of his constitutional rights under the Fourth Amendment.

138.    Plaintiff is entitled to recover his damages, in an amount to be established at trial but believed to be no less than $10 Million Dollars.

## AS AND FOR A THIRD CLAIM FOR RELIEF
## UNDER 42 U.S.C §1983
## (FOURTH AMENDMENT - MALICIOUS PROSECUTION)

139.    Plaintiff repeats and reiterates the allegations contained in paragraphs marked and designated "1" through "138" of this complaint with full force and effect as if more fully set forth at

length herein.

140.    Plaintiff had a clear right to be free from unreasonable and unjustifiable prosecution and litigation, as guaranteed to him under the Fourth Amendment to the Constitution of the United States, which right was known to the defendants.

141.    The individual defendants herein acted under color of federal law, pursuant to a

COMPLAINT

but believed to be no less than $10 Million Dollars.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### UNDER 42 U.S.C. §1983
### (FIFTH AND FOURTEENTH AMENDMENTS)

150.   Plaintiff repeats and reiterates the allegations contained in paragraphs marked and designated "1" through "149" of this complaint with full force and effect as if more fully set forth at length herein.

151.   The plaintiff has a valid property interest in his employment, which interest is protected by the United States and New York Constitutions, which interest cannot be terminated without due process of law.

152.   The defendants herein acted under color of federal law.

153.   The defendants intentionally and/or negligently deprived plaintiff of his property interests by, inter alia, their wrongful acts, in violation of plaintiff's rights to due process under the Fifth and Fourteenth Amendments.

154.   By virtue thereof, plaintiff is entitled to damages in an amount to be established at trial but believed to be no less than $10 Million Dollars.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### FOR RETALIATORY ACTION

155.   Plaintiff reiterates and repeats all the allegations contained in the paragraphs marked and designated "1" through "154" as if more fully set forth at length herein.

156.   The defendants herein had a retaliatory motive in pursuing plaintiff's false arrest, imprisonment, and malicious prosecution.

157.   The defendants punished plaintiff for exercising his right to Free Speech under the

COMPLAINT

163.　Plaintiff repeats and reiterates the allegations contained in the paragraphs marked and designated "1" through "162" of this complaint with full force and effect as if more fully set forth at length herein.

164.　The defendants had authority to issue process and initiate criminal proceedings against individuals for violations of both state and federal laws, upon a showing of probable cause or with a warrant for an individual's arrest.

165.　By initiating a criminal proceeding against Plaintiff, Defendants abused their prosecutorial powers to obtain a result other than the lawful prosecution of Plaintiff, namely the collateral objective of causing Plaintiff to be suspended and/or terminated from his position on the force and to "get rid of him."

166.　Defendants did not act in a reasonably prudent manner or in good faith.

167.　By reason of defendant's abuse of process under the Federal Tort Claims Act, Plaintiff is entitled to damages, including legal fees, in an amount to be established at trial but believed to be in excess of Ten Million Dollars.

## AS AND FOR A NINTH CLAIM FOR RELIEF
## UNDER THE FEDERAL TORT CLAIMS ACT

168.　Plaintiff repeats and reiterates the allegations contained in the paragraphs marked and designated "1" through "167" of this complaint with full force and effect as if more fully set forth at length herein.

169.　By reason of Plaintiff's false imprisonment by Defendants, Plaintiff is entitled to damages under the Federal Tort Claims Act, including legal fees, in an amount to be established at trial

but believed to be in excess of Ten Million Dollars.

## AS AND FOR A TENTH CLAIM FOR RELIEF
## UNDER THE FEDERAL TORT CLAIMS ACT

170.    Plaintiff repeats and reiterates the allegations contained in the paragraphs marked and designated "1" through "169" of this complaint with full force and effect as if more fully set forth at length herein.

171.    By reason of defendants' false arrest of plaintiff, plaintiff is entitled to damages under the Federal Tort Claims Act, including legal fees, in an amount to be established at trial but believed to be in excess of Ten Million Dollars.

## AS AND FOR AN ELEVENTH CLAIM FOR RELIEF
## UNDER THE FEDERAL TORT CLAIMS ACT

172.    Plaintiff repeats and reiterates the allegations contained in the paragraphs marked and designated "1" through "171" of this complaint with full force and effect as if more fully set forth at length herein.

173.    Defendants owed plaintiff a duty of care in the performance of their duties.

174.    Defendants were negligent in arresting plaintiff and keeping plaintiff incarcerated for almost 36 hours, since plaintiff should have been issued a citation and released.

175.    Defendants were further negligent in keeping plaintiff incarcerated, knowing that, *inter alia*, they had received a hospital report which demonstrated that there was no probable cause to hold plaintiff and that the complainant had stated she had consensual sex with plaintiff and refused a rape-kit test.

176.    By virtue thereof, plaintiff seeks damages under the Federal Tort Claims Act, including legal fees, for the defendants' negligence in the amount of Ten Million Dollars.

177.    Plaintiff has no adequate remedy at law.

COMPLAINT

178.   Plaintiff demands a jury trial.

## **RELIEF REQUESTED**

**WHEREFORE**, plaintiff seeks a judgment as follows:

A.      On the First Claim for Relief, for violations of 42 U.S.C. §1983 (Fourth Amendment), damages to be established at trial but believed to be in excess of $10 million dollars;

B.      On the Second Claim for Relief, for violations of 42 U.S.C §1983 (Fourteenth Amendment), damages to be established at trial but believed to be in excess of $10 million dollars.

C.      On the Third Claim for Relief, for violations of 42 U.S.C. §1983 (Fourth Amendment), damages to be established at trial but believed to be in excess of $10 million dollars;

D.      On the Fourth Claim for Relief, for violations of 42 U.S.C. §1983 (Fifth and Fourteenth Amendments), damages to be established at trial but believed to be in excess of $10 million dollars;

E.      On the Fifth Claim for Relief, for violations of 42 U.S.C. §1983 (retaliatory motive), damages to be established at trial but believed to be in excess of $10 million dollars;

F.      On the Sixth Claim for Relief, under 42 U.S.C. §1988, for the costs and attorneys fees incurred by plaintiff;

G.      On the Seventh Claim for Relief, for violations of the Federal Tort Claims Act, damages to be established at trial but believed to be in excess of $10 million dollars;

H.      On the Eighth Claim for Relief, for violations of the Federal Tort Claims Act, damages to be established at trial but believed to be in excess of $10 million dollars;

I.      On the Ninth Claim for Relief, for violations of the Federal Tort Claims Act, damages to be established at trial but believed to be in excess of $10 million dollars;

J.      On the Tenth Claim for Relief, for violations of the Federal Tort Claims Act, damages to be established at trial but believed to be in excess of $10 million dollars;

K.      On the Eleventh Claim for Relief, for violations of the Federal Tort Claims Act, damages to be established at trial but believed to be in excess of $10 million dollars;

COMPLAINT

L.     Together with such other, further, and different relief as this Court may deem just and proper.

Dated: Garden City, New York
      February 18, 2003

                              DOMINIC A. BARBARA, ESQ. (DB-0190)
                              LAW OFFICES OF DOMINIC A. BARBARA
                              *Attorneys for Plaintiff*
                              1100 Stewart Avenue
                              Garden City, New York 11530
                              (516) 222-2333

COMPLAINT